2002 UT 101

Paul HOUGHTON, Billie Henderson, individually and each as representative of a class, Damian Henderson, Wayne Rubens, Ron Roes and Susan Roes, who are other members of these classes, similarly situated, Plaintiffs and Appellants,

v.

DEPARTMENT OF HEALTH, the Office of Recovery Services, the Department of Human Services and the State of Utah (the "State Defendants"), et al., Defendants and Appellees.

No. 20001103.

Supreme Court of Utah.

Oct. 18, 2002.

Robert B. Sykes, Salt Lake City, for plaintiff.

Mark L. Shurtleff, Att'y Gen., Reed M. Stringham III, Steve A. Combe, Brent A. Burnett, Asst. Att'ys Gen., Salt Lake City, for defendants.

DURRANT, Associate Chief Justice.

¶ 1 This appeal concerns priority liens and attorney fees related to Medicaid recipients' settlements with third parties. In this class action lawsuit, the district court certified two classes of plaintiffs, both of which contend on appeal that the State's priority lien on plaintiffs' settlement proceeds violates federal law and that the district court erred in granting the State's motion for judgment on the pleadings on this issue. One class ("Class II plaintiffs"), whose members retained attorneys, also argues that the district court incorrectly granted the State's motion for summary judgment on the issue of attorney fees. We affirm the district court's approval of the State's priority lien, but reverse its grant of summary judgment on the attorney fees claim brought by Class II plaintiffs and remand for further proceedings consistent with this opinion.

## BACKGROUND

 ¶ 2 In reviewing a grant of a motion for judgment on the pleadings, we accept "the factual allegations in the complaint as true" and "consider such allegations and all reasonable inferences drawn therefrom in a light most favorable to the plaintiff." *Healthcare Servs. Group v. Utah Dep't of Health*, 2002 UT 5, ¶ 3, 40 P.3d 591 (internal quotation and citation omitted). Additionally, "[i]n reviewing a grant of summary judgment, we review the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Regal Ins. Co. v. Bott*, 2001 UT 71, ¶ 2, 31 P.3d 524. We recite the facts accordingly.

¶ 3 Pursuant to section 26–19–5(1)(b) of the Utah Code,[1] the State of Utah placed priority liens on proceeds from settlements that Medicaid recipients ("plaintiffs") had negotiated with the third parties who had injured them. On October 27, 1995, plaintiffs brought a class action suit against the State, claiming, among other things, that section 26–19–5(1)(b) was inconsistent with federal law prohibiting liens against Medicaid recipients'

property and therefore invalid. The district court certified two classes of plaintiffs, Class I and Class II.[2] Both classes were composed of Medicaid recipients on whose settlement proceeds the State had placed a priority lien. Only Class II, however, included members who had retained counsel, both for making claims against liable third parties and negotiating lien payments with the State. Class II plaintiffs claimed that the State did not offset from its recovery the attorney fees Class II plaintiffs had incurred in negotiating their settlements and demanded reimbursement.

¶ 4 On October 27, 1999, the State moved for judgment on the pleadings, arguing that our decisions in *S.S. v. State*, 972 P.2d 439, 442 (Utah 1998), and *Wallace v. Estate of Jackson*, 972 P.2d 446, 448 (Utah 1998), which upheld the validity of liens on third-party Medicaid settlements, nullified plaintiffs' claims. The district court granted the motion with respect to the priority lien issue, ruling that *S.S.* and *Wallace* rendered plaintiffs' attack on the priority lien invalid, but denied the motion with respect to attorney fees on the ground that those decisions did not address that issue.

¶ 5 On May 24, 2000, the State moved for summary judgment on the remaining issue of attorney fees, submitting affidavits claiming that Class II's named members had either not incurred attorney fees or had already received their offset. In response, Class II plaintiffs submitted the affidavit of an attorney stating that he represented two individuals entitled to attorney fees related to their settlements with third parties and that the State had refused to allow offset of those fees. · On June 21, 2000, Class II plaintiffs filed a "First Request for Production of Documents," seeking evidence regarding Medicaid recipients who had incurred attorney fees in retaining attorneys to help them negotiate their third-party settlements. The State refused the request, claiming that the language used in the discovery request was overly broad, and moved for a protective order against producing the documents plaintiffs

---

1. Section 26–19–5(1)(b) reads as follows: "The department's claim to recover medical assistance provided as a result of the injury, disease, or disability is a lien against any proceeds payable to or on behalf of the recipient by that third party. This lien has priority over all other claims to the proceeds, except claims for attorney's fees and costs authorized under Subsection 26–19–7(4)." Utah Code Ann. § 26–19–5(1)(b) (1998).

2. The State did not oppose the motion to certify the classes.

had requested. On July 25, 2000, plaintiffs moved to compel production of evidence,[3] but on November 13, 2000, the district court granted the State's motion for summary judgment and dismissed plaintiffs' claim with prejudice, reasoning that the claims of all plaintiffs, named and unnamed, failed on the merits because the named plaintiffs either had not retained attorneys or had already received their offset from the State.

¶ 6 Plaintiffs appeal, and we have jurisdiction pursuant to Utah Code Ann. § 78-2-2(3) (Supp.2001). On appeal, both classes of plaintiffs abandon their argument that subsection 26-19-5(1)(b) is invalid under federal law prohibiting liens against Medicaid recipients' property and instead maintain that the priority of the State's lien has the effect of violating federal law. Class II plaintiffs further maintain that the failure of the named plaintiffs' claims for attorney fees does not moot the claims of the unnamed class members.

## ANALYSIS

### I. STANDARD OF REVIEW

 ¶ 7 Because both a judgment on the pleadings and a summary judgment involve questions of law, we review both for correctness and accord the district court's decision no deference. *In re Estate of West,* 948 P.2d 351, 353 (Utah 1997).

### II. LEGALITY OF THE PRIORITY LIEN

 ¶ 8 It is well settled in Utah that liens against third-party settlement proceeds do not violate federal law because settlement payments do not become a recipient's property until Medicaid is reimbursed.[4] *S.S.,* 972 P.2d at 442 (Utah 1998) ("Payments made by

a third party do not legally become the property of the recipient *until after a valid settlement, which necessarily must include reimbursement to Medicaid.*") (emphasis added); *State v. McCoy,* 2000 UT 39, ¶ 10, 999 P.2d 572; *Wallace,* 972 P.2d at 448. Plaintiffs concede that the State's lien itself does not violate federal law, but argue that the lien's *priority* status gives it an illegal effect. Specifically, plaintiffs contend that because the priority of the State's lien allows the State to reimburse itself completely and before Medicaid recipients can use the settlement proceeds to satisfy their claims, the lien could result in a seizure of the recipient's property. They argue that this could occur because, after the State takes its share of settlement proceeds, there may be nothing left with which Medicaid recipients can be compensated for their nonmedical claims, and nonmedical claims are a Medicaid recipient's property. We disagree.

¶ 9 The federal statute requires only that a lien not encumber a Medicaid recipient's property and places no additional restrictions on the priority of otherwise valid liens. We have already held on three occasions that liens against third-party settlement proceeds are valid because those proceeds do not become a Medicaid recipient's property until Medicaid is reimbursed, *see McCoy,* 2000 UT 39 at ¶ 10, 999 P.2d 572, *S.S.,* 972 P.2d at 442, *Wallace,* 972 P.2d at 448; thus, a priority lien on a recipient's third-party settlement proceeds does not encumber the recipient's property, even if those proceeds include compensation for nonmedical claims. Accordingly, the district court correctly concluded that the State's priority lien on Medicaid recipients' third-party settlement proceeds did not violate federal law prohibiting liens against Medicaid recipients' property.[5]

3. Additionally, on April 17, 1996, plaintiffs filed a notice of depositions and request for production of documents, requesting, among other things, the identities of those plaintiffs who had and had not retained counsel. The State countered by moving for a protective order against discovery. On November 20, 1998, plaintiffs moved for a scheduling conference, proposing June 1, 1999, as a deadline for completing discovery. Because the State filed a motion for a protective order on July 11, 2000, we assume that discovery was not completed by this deadline, at least on the issue of attorney fees. We further assume that plaintiffs' attempts at discovery had been unsuccessful.

4. Federal law prohibits the imposition of liens "against the property of any individual ... on account of medical assistance paid or to be paid on his behalf under the State plan." 42 U.S.C. § 1396p(a)(1) (2002).

5. In her dissent, Justice Durham relies heavily on a newly decided Minnesota case, *Martin v. Rochester,* 642 N.W.2d 1 (Minn.2002), which criticizes this court's opinions in *Wallace* and *S.S.* We decline to abandon our well-established precedent in favor of the *Martin* approach, which, in our view, would produce "results that would jeopardize the ultimate goal of Medicaid—

## III. ATTORNEY FEES

¶ 10 Having concluded that the State's priority lien against Medicaid recipients' third-party settlements is permissible under federal law, we next examine Class II plaintiffs' argument that the district court erred in granting the State's motion for summary judgment and dismissing their claims for attorney fees with prejudice. The State concedes that the district court erred in dismissing Class II plaintiffs' claims with prejudice, but maintains that the error was harmless because Class II plaintiffs received no notice of either the class action or its dismissal and so are not bound by the district court's decision. The parties therefore agree that the district court erred with respect to the attorney fees issue; they differ only in the remedies they propose. Class II plaintiffs ask us to reverse the district court's grant of summary judgment, while the State asks us to simply modify the district court's dismissal so as to be without prejudice, thereby allowing unnamed Class II plaintiffs to reconstitute and begin anew their action for attorney fees. Because reversing the district court's grant of summary judgment and remanding for further discovery places Class II plaintiffs in the same position as if we modified the dismissal so as to be without prejudice, only without the additional steps of reconstituting and refiling, we are persuaded, on judicial economy grounds, to accept Class II plaintiffs' proposal. We therefore reverse the district court on the issue of attorney fees and remand for further discovery.

## CONCLUSION

¶ 11 We affirm the district court's ruling approving the State's priority lien on plaintiffs' third-party settlement proceeds. We reverse the district court's grant of the State's motion for summary judgment on Class II plaintiffs' attorney fees claim. We therefore remand for further proceedings consistent with this opinion.

¶ 12 Justice HOWE, Justice RUSSON, and Justice WILKINS concur in Associate Chief Justice DURRANT's opinion.

DURHAM, Chief Justice, concurring and dissenting.

¶ 13 I concur in Part III of the majority opinion, but respectfully suggest that Part II has it wrong.

¶ 14 In companion cases decided in 1998, *S.S. v. State*, 972 P.2d 439 (Utah 1998), and *Wallace v. Jackson*, 972 P.2d 446 (Utah 1998), this court followed the example of the New York Court of Appeals in upholding state laws that place a lien on third-party settlement proceeds allocated to Medicaid recipients. *See Cricchio v. Pennisi*, 90 N.Y.2d 296, 660 N.Y.S.2d 679, 683 N.E.2d 301 (1997). By so doing, this court saved state liens from preemption by a federal statute prohibiting liens on Medicaid recipients' property by holding that "[p]ayments made by a third party do not legally become the property of the recipient until after a valid settlement, which necessarily must include reimbursement to Medicaid." *S.S.*, 972 P.2d at 442.

that the program be the pay[er] of last resort." *Calvanese v. Calvanese*, 93 N.Y.2d 111, 688 N.Y.S.2d 479, 710 N.E.2d 1079, 1082, *cert. denied*, 528 U.S. 928, 120 S.Ct. 323, 145 L.Ed.2d 252 (1999), *see also S.S.*, 972 P.2d at 443. Indeed, the legislative history of the federal statute clearly indicates that Congress specifically "intended [Medicaid] to be the payer of last resort, that is, other available resources must be used before Medicaid pays for the care of an individual enrolled in the Medicaid program." S.Rep. No. 99–146, at 312 (1986), *reprinted in* 1986 U.S.C.C.A.N. 42, 279. While the dissent and *Martin* rely heavily on preemption arguments regarding conflicts between state statutes and the "goal," or "purposes of the federal Medicaid scheme," *Martin*, 642 N.W.2d at 16, neither addresses this overarching goal. Further, it is worth noting that a number of other courts have reached results that—although, like *Martin*, not

controlling—are consistent with the precedent we established in *Wallace*, *S.S.*, and *McCoy*, and which we follow today. *See Sullivan v. County of Suffolk*, 174 F.3d 282, 286 (2d Cir.1999) *cert. denied* 528 U.S. 950, 120 S.Ct. 372, 145 L.Ed.2d 290; *Fla. Agency for Health Care Admin. v. Estabrook*, 711 So.2d 161, 166–167 (Fla.Dist.Ct.App. 1998); *Nacino v. Chandler*, No. 23572, ── Hawai'i ──, ──, ── P.3d ──, ──, 2002 WL 31019351, 2002 Haw.App. Lexis 187, at *36 (Haw.Ct.App., Sept. 11, 2002); *Roberts v. Total Health Care, Inc.*, 349 Md. 499, 709 A.2d 142, 152 (1998); *Waldman v. Candia*, 317 N.J.Super. 464, 722 A.2d 581, 586 (1999); *Grey Bear v. N.D. Dep't of Human Servs.*, 651 N.W.2d 611, 2002 ND 139, ¶ 14; *Calvanese*, 688 N.Y.S.2d 479, 710 N.E.2d at 1082; *Wilson v. State*, 142 Wash.2d 40, 10 P.3d 1061, 1068 (2000), *cert. denied*, 532 U.S. 1020, 121 S.Ct. 1959, 149 L.Ed.2d 755 (2001).

Under the majority's reasoning here, a state's lien attaches to the property of a liable third party, not to a recipient's property. This case provides an opportunity for the court to reexamine the position it adopted four years ago, an opportunity to develop a more refined conception of the property rights created by an incident giving rise to an injury, and an opportunity to ensure that state law conforms to both the letter and spirit of federal mandates.

## I. FEDERAL MEDICAID PROVISIONS

¶ 15 The federal law structuring federal and state functions in administering Medicaid simultaneously imposes on states a duty to collect reimbursement and a limit on the means states can employ in fulfilling their collection obligations. States' collection efforts are limited both as to the *sources* to which they can look for reimbursement and as to the *extent* to which they may expect reimbursement for Medicaid funds expended.

¶ 16 Federal provisions requiring recipients to assign certain claims to the state suggest that states look for reimbursement to any third parties liable to pay for a recipient's medical expenses. States must condition Medicaid eligibility on assignment to the state of any Medicaid recipient's "rights ... to payment for medical care from any third party." 42 U.S.C. § 1396k(a)(1)(A) (1992). While states are explicitly required to obtain an assignment of rights before an individual becomes eligible for Medicaid, the recipient's rights to payment for medical care are deemed assigned to the state in any event:

(a) A state plan for medical assistance must ... (25) provide ... (H) that to the extent that payment has been made under the State plan for medical assistance in any case where a third party has a legal liability to make payment for such assistance, the State has in effect laws under which, to the extent that payment has been made under the State plan for medical assistance for health care items or services furnished to an individual, *the State is considered to have acquired the rights of such individual to payment by any other party* for such health care items or services.

42 U.S.C. § 1396a(a)(25)(H) (Supp.2002)(emphasis added). In acquiring a recipient's right to payment from third parties, the state also acquires the right to enforce payment through legal means. The provisions governing claims both actually assigned and those deemed assigned to a state unequivocally give states the right to pursue directly any liable third party for the costs expended by a state for a recipient's medical care.[1]

¶ 17 The federal scheme for reimbursement does not merely provide states with rights to recover their expenditures, it also imposes an obligation to do so.

(a) A state plan for medical assistance must ... (25) provide ... (B) that in any case in which such a legal liability is found to exist after medical assistance has been made available on behalf of the individual ... the State ... *will seek* reimbursement for such assistance to the extent of such legal liability.

42 U.S.C. § 1396a(a)(25)(B) (Supp.2002)(emphasis added). While § 1396a(a)(25)(B) requires states to seek reimbursement, it does not appear to direct states to look to any particular source for that reimbursement. When read together with the preceding section, however, the contours of the federal collection scheme emerge in greater detail:

(a) A state plan for medical assistance must ... (25) provide (A) that the State ... will take all reasonable measures to ascertain the legal liability of third parties ... to pay for care and services available under the plan, (i) including the collection of sufficient information ... to enable the State to *pursue claims against such third parties* [.]

42 U.S.C. § 1396a(a)(25)(A) (Supp.2002) (emphasis added).

¶ 18 The state is thus directed in § 1396a(a)(25)(A) to gather information "to enable the State to pursue claims against ... third parties," and, in the subsection immediately following, is required to seek reimbursement. 42 U.S.C. § 1396a(a)(25)(B) (Supp.2002). The implication is clear that a state's mandate to seek reimbursement is

---

1. Whether or not a recipient retains a right to pursue assigned claims for medical expenses de- | pends on the applicable state statute and the scope of the assignment.

directed to action against third parties. Assignment provisions enable the state to take action directly against third parties, while reimbursement provisions require it to do so.

¶ 19 Two themes emerge from the foregoing examination of these provisions. States are explicitly required to pursue reimbursement for funds expended, and, while § 1396a(a)(25)(B) does not specify from whom that reimbursement is to be sought, reading § 1396a(a)(25)(A) and (B) together strongly suggests that it is third parties who are intended to be the source of reimbursement.[2]

¶ 20 The same passages that designate the liable third party as the proper *source* of reimbursement also set limits on the *extent* to which a state may recover; the measure of a state's recovery from third parties is not a state's *expenditures* for medical expenses, but a third party's *liability* for medical expenses. The federal assignment provision makes assignment of "rights . . . to payment *for medical care* " a condition of eligibility for Medicaid. 42 U.S.C. § 1396k(a)(1)(A) (emphasis added). Similarly, the claims deemed assigned under § 1396a(a)(25)(H) are limited to "the rights of such individual to payment by any other party *for such health care items or services.*" 42 U.S.C. § 1396a(a)(25)(H) (emphasis added). These limits on the permissible extent of a state's recovery are recapitulated in those provisions imposing a

duty on states to seek reimbursement. States are required to ascertain the liability of third parties "to pay *for care and services* available under the plan,"[3] and, when a legal liability is found to exist, to "seek reimbursement for such assistance [as was provided by Medicaid] *to the extent of such legal liability.*" 42 U.S.C. § 1396a(a)(25)(A) and (B) (emphasis added). Thus, the extent of a state's claim against a third party is limited by the third party's liability *for medical expenses,* not by the third party's total liability to a recipient or by the state's actual expenditures for medical expenses.

¶ 21 These implicit limits in the federal statutes on the sources to which a state may look *for reimbursement* and on the extent to which the state may recover are supplemented by an explicit limit on both source and extent of recovery:

> No lien may be imposed against the property of any individual prior to his death on account of medical assistance paid or to be paid on his behalf under the State plan. . . .

42 U.S.C. § 1396p(a)(1) (Supp.2002). The prohibition on liens on a recipient's property compels states to pursue third parties rather than recipients and prevents states from augmenting from the assets of recipients any deficiencies remaining after collection from third parties.

---

**2.** The language of the federal assignment provision also suggests that the recipient's role is to assist the state in collecting from liable third parties, rather than to be a source of reimbursement. Section 1396k(a)(1)(C)(1992) mandates that state law require the recipient

> to cooperate with the State in identifying, and providing information to assist the State in pursuing, any third party who may be liable to pay for care and services available under the plan, unless such individual has good cause for refusing to cooperate as determined by the State agency in accordance with standards prescribed by the Secretary, which standards *shall take into consideration the best interests of the individuals involved.*

42 U.S.C. § 1396k(a)(1)(C)(emphasis added). The role of the recipient in the federal scheme is to assign rights to payment to the state, § 1396k(a)(1)(A); to cooperate in establishing paternity and obtaining support payments under specified circumstances, § 1396k(a)(1)(B); and to assist the state in identifying liable third parties (unless it is not in the recipient's best interest

to do so), § 1396k(a)(1)(C). Thus, the recipient's role in this scheme is largely to assist the state in fulfilling its own responsibilities. The qualification of the duty to cooperate in identifying liable third parties in § 1396k(a)(1)(C) is particularly telling; the federal scheme imposes some obligations on the recipient, but those obligations can give way if they undermine the recipient's best interests. It seems unlikely that a plan so solicitous of recipients' interests would nevertheless allow states to strip recipients of what is likely to be their only financial resource: settlement proceeds.

**3.** The language of section 1396a(a)(25)(A) suggests that even some claims *for medical expenditures* may be retained by the recipient. A state is entitled to capitalize on the third party's liability for medical expenses covered under Medicaid. Should a third party's liability for medical expenses extend beyond what is provided by Medicaid, these additional expenditures, according to the language of section 1396a(a)(25), appear to be unavailable for state reimbursement.

¶ 22 The scheme set out in 42 U.S.C. section 1396 represents Congress' determination of the appropriate balance between a state's obligation to collect reimbursement for Medicaid expenditures and an individual Medicaid recipient's need to shield property from a state's collection efforts. The two interests serve to limit one another; the federal assignment provisions ensure that a Medicaid recipient cannot retain settlement or judgment proceeds designated for medical expenses, and the federal anti-lien provisions ensure that states cannot use portions of a settlement designated for damages other than medical expenses, belonging to a recipient, to reimburse itself for medical expenses. State laws that attempt to alter this balance by allowing a recipient to retain proceeds intended for medical expenses, or by allowing a state to reimburse itself from proceeds not intended for medical expenses, conflict with this scheme and are subject to preemption.

## II. PREEMPTION

¶ 23 In developing standards for analyzing state law preemption, this court has drawn from United States Supreme Court jurisprudence governing the preemption of state law by federal. Although

> Utah case law has addressed preemption several times . . . we have not developed a detailed analytical model for determining preemptive intent. We therefore find it useful to look to the United States Supreme Court which over the years has developed a helpful preemption model. . . .

*Price Development Company v. Orem,* 2000 UT 26, ¶ 12, 995 P.2d 1237. It is congressional intent to preempt that is determinative; "determining whether a particular statute preempts other law of inferior standing is essentially a question of legislative intent." *Gilger v. Hernandez,* 2000 UT 23, ¶ 9, 997 P.2d 305 (citations omitted). The centrality of congressional intent in preemption analysis is borrowed from the federal analytical model; the question of preemption is

> basically one of congressional intent. Did Congress, in enacting the Federal Statute, intend to exercise its constitutionally delegated authority to set aside the laws of a State? If so, the Supremacy Clause requires courts to follow federal, not state law.

*Barnett Bank v. Nelson,* 517 U.S. 25, 30, 116 S.Ct. 1103, 134 L.Ed.2d 237 (1996) (citations omitted).

¶ 24 Congressional intent to preempt state law can manifest itself in a variety of ways, all of which require preemption of the offending state statutory provisions. While a federal law may explicitly state that it preempts state law in the field, more often the determination of congressional intent requires an inquiry into the purposes underlying the federal law.

> Sometimes courts, when facing the preemption question, find language in the federal statute that reveals an explicit congressional intent to pre-empt state law. More often, explicit pre-emption language does not appear, or does not directly answer the question. In that event, courts must consider whether the federal statute's "structure and purpose," or nonspecific statutory language, nonetheless reveal a clear, but implicit, pre-emptive intent. A federal statute, for example, may create a scheme of federal regulation "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it." Alternatively, federal law may be in "irreconcilable conflict" with state law. Compliance with both statutes, for example, may be a "physical impossibility," or, the state law may "stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."

*Id.* at 31, 116 S.Ct. 1103 (citations omitted).

¶ 25 *Barnett* suggests that there are three categories of statutory schemes that can reflect congressional intent to preempt state law: (1) statutes containing explicit language to that effect; (2) statutory structure or purpose revealing a clear preemptive intent; or (3) statutes that result in a conflict between state and federal law. (Conflict preemption is further subdivided into (a) situations in which simultaneous compliance with state and federal law is impossible and (b) circumstances in which state laws undermine congressional purposes.) This court, quoting in *Price* the foregoing language from *Barnett,* structured preemption analysis differently. For the three categories of congressional intent described above, this court substituted

four equally weighted categories. The impossibility of simultaneous compliance and the undermining of federal purposes become, in the version of preemption analysis articulated in *Price*, separate categories, not aspects of conflict analysis.

¶ 26 The category under which a court chooses to analyze the preemption issue can have significant effects on the result. When treated as one aspect of conflict between state and federal law, analysis of whether state law tends to undermine federal purposes (category 3(b) under *Barnett*) is susceptible to being conflated with overt conflict between federal and state law (category 3(a)), and therefore overlooked.[4] In *S.S.*, this court applied the test for preemption in a manner that tended to elide questions of whether the relevant state provisions undermined federal purposes: "a federal statute will preempt a state statute only in the case of an *actual conflict* unless the federal statute has been shown to preemptively occupy the field.... We find no irreconcilable conflict here...." *S.S.*, 972 P.2d at 443 (emphasis added). We have recognized that actual conflict may include conflict with the "provisions *or goals*" of a statute of superior authority, *Smith v. Batchelor*, 832 P.2d 467, 472 (Utah 1992) (emphasis added), but the court's analysis of conflicts in *S.S.* and *Wallace* focused primarily on the impossibility of dual compliance. The court explicitly addressed the need to harmonize federal provisions requiring states to seek reimbursement and the federal anti-lien provision, but did not fully examine the purposes the anti-lien provision is intended to serve, or whether the court's resolution is likely to undermine that purpose. The federal jurisprudence on which Utah preemption analysis relies makes it clear that while there is no "infallible constitutional test or ... exclusive constitutional yardstick" for determining congressional intent, *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941), the court's

primary function is to determine whether, under the circumstances of this particular case ... [state] law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. *Id.; see also Florida Lime & Avocado Growers v. Paul*, 373 U.S. 132, 141, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963); 517 U.S. 25 at 31, 116 S.Ct. 1103, 134 L.Ed.2d 237 (1996). An inquiry into the goals underlying a federal statute is a necessary element in a court's preemption analysis, an element this court adopted, and even highlighted, in its statement of the preemption model in *Price*.

¶ 27 There is obviously no congressional intent in the federal Medicaid statutes to preempt state legislation altogether; federal law mandates state legislation in the area, albeit in conformity with federal guidelines. Where neither explicit preemption, nor an intent to occupy the field is present, it nonetheless remains possible that state legislation may conflict with or otherwise undermine the purposes and objectives of the federal scheme. This consideration, in addition to those emphasized in *S.S.* and *Wallace*, must be part of our preemption calculus.

## III. UTAH MEDICAID PROVISIONS

¶ 28 Utah's Medicaid provisions address the federal requirements of assignment and reimbursement, but in an apparent effort to ensure the state a high degree of flexibility with regard to both the source and extent of reimbursement, are so broadly drafted as to permit acts that go beyond the limits set by federal law. The statute reads:

The department's claim to recover medical assistance provided as a result of the injury ... is a lien against *any proceeds* payable to or on behalf of the recipient by that third party.

Utah Code Ann. § 26–19–5(1)(b) (1998) (emphasis added). The state lien provision on its face exceeds federal limits both as to the

---

4. The Tenth Circuit Court of Appeals has contributed a useful categorization of "at least" four circumstances in which preemption can occur: (1) express preemption, which results when Congress expresses a clear intent to preempt state law, (2) implied preemption, which results when state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," (3) con-

flict preemption, which results from an actual conflict between federal and state law even though Congress is silent, and (4) field preemption, which results from a determination that Congress intended to remove an entire subject from state regulatory authority. *Evans v. Bd. of County Comm'rs*, 994 F.2d 755, 760 (10th Cir.1993) (citations omitted).

source and extent of permissible state recovery, since it allows a lien to attach to proceeds on which the recipient has a legal claim and also appears to allow the lien to attach to any proceeds, rather than only to those designated for medical expenses.

¶ 29 In *Wallace* and *S.S.* a majority of this court saved the state's lien provision from preemption by the federal anti-lien provision by holding that the settlement proceeds to which the state's lien attaches are the property of the third party, not the designated beneficiary of the settlement. While this reading operated to spare the statute from "actual conflict" with federal law, it comports awkwardly with well-established Utah law determining the effects of judgments on property rights. The court's interpretation of Utah's lien provision rested on the assumption that the subject matter of a judgment (the value determined to be owed to the judgment creditor) is not the property of the judgment creditor at the moment judgment is entered, but remains the property of the judgment debtor. This analysis is difficult to reconcile with other provisions of Utah law that give a judgment creditor a lien in some of the assets of the judgment debtor at the moment judgment is entered:

> [T]he entry of judgment by a district court creates a lien upon the real property of the judgment debtor .... located in the county in which the judgment is entered.

Utah Code Ann. § 78–22–1(2) (Supp.2001)(current version at Utah Code Ann. § 78–22–1(7)(a) (Supp.2001)).[5] While under Utah law a judgment does not of its own force immediately transfer ownership of real property to the judgment creditor, by statute a judgment does, the moment it is entered, create a lien on certain types of property owned by the judgment debtor. When this lien is enforced through execution and sale,[6] the proceeds are the property of the judgment creditor. While that property could be made subject to other liens by other creditors, it remains indisputably the property of the judgment creditor; indeed, other liens may attach precisely because the property belongs to the judgment creditor.

¶ 30 While the judgment lien created upon entry of a judgment is not equivalent to ownership of the property to which the lien attaches, it is a form of security for payment that can be readily transformed into ownership. This court has had occasion to observe that "a judgment lien has always been regarded as the highest form of security to a [creditor].'"[7] *Belnap v. Blain* 575 P.2d 696, 700 (Utah 1978) (citation omitted). Absent explicit statutory language to that effect, it seems unlikely the legislature intended to eliminate judgment liens or to postpone their attachment when the judgment creditor is a Medicaid recipient.[8] The conclusion in *S.S*

---

5. After July 1, 2002, it is no longer entry of a judgment, but recordation of the judgment in the office of the county recorder, that creates a lien on real property. Utah Code Ann. § 78–22–1(7)(a) (Supp.2001).

6. Levy of execution "is ordinarily the only proper method to enforce a judgment lien." *Belnap v. Blain*, 575 P.2d 696, 700 (Utah 1978).

7. *Belnap* misquotes its source, *Kinney v. Vallentyne*, 15 Cal.3d 475, 124 Cal.Rptr. 897, 541 P.2d 537. In *Kinney* the court observed that "a judgment lien has always been regarded as the highest form of security to a *creditor.*" *Id.* 124 Cal. Rptr. 897, 541 P.2d at 539 (quoting *Morton v. Adams*, 124 Cal. 229, 56 P. 1038 (1899) (emphasis added)). In *Belnap* this court cited *Kinney*, but mistakenly stated that a judgment lien is security for a judgment debtor, rather than a judgment creditor.

8. The state provision does give priority status to its Medicaid lien:

> The department's claim to recover medical assistance provided ... is a lien against any *proceeds* payable to or on behalf of the recipient by that third party. This lien has priority over all other claims to the proceeds, except claims for attorney's fees and costs....

Utah Code Ann. § 26–19–5(1)(b) (1998). The lien provision does not, however, alter the method established in Utah Code Ann. § 78–22–1(2) for determining whose property the proceeds are. The Medicaid lien does not attach to real property, but to "proceeds payable" to the recipient. Since the statute does not define proceeds, recourse to the definition in Black's Law Dictionary is appropriate. Black's defines proceeds as "[t]he value of land, goods, or investments when converted into money." *Black's Law Dictionary* 1222 (7th ed.1999). The state Medicaid lien would thus attach to the money realized from an execution sale. The money realized by an execution sale is indisputably the property of the judgment creditor, here the Medicaid recipient, even if those proceeds are subject to liens. A state law that permits a Medicaid lien on the property of the Medicaid recipient expressly contradicts the

and *Wallace* that the subject matter of a judgment remains the property of the third-party debtor until after Medicaid is reimbursed thus fits awkwardly with a legislative scheme that gives the judgment creditor, at the moment a judgment is entered, a legal interest in property that can be converted into ownership of proceeds through execution and sale.[9] The court's preliminary resolution of the potential conflict between state and federal lien provisions rests on the assumption that the recipient has no legal interest in the proceeds of a judgment; this position is not consistent with Utah statutory and common law concerning the effect of a judgment on the judgment creditor's interest in the subject matter of the judgment.

¶ 31 If Utah's Medicaid statute permits the state to obtain a lien on what is in fact the recipient's property, then Utah's lien provisions would be subject to preemption under the conflict aspect of the preemption model outlined above. A state law that explicitly permits what is clearly prohibited by federal law makes compliance with both laws impossible.

¶ 32 The notion in *Wallace* that the money realized from third-party settlements or judgments remains the property of the third party is not an argument informed by Utah's law of property or judgments, but an argument based on statutory construction. The opinion observed that "sections of a statute should be harmonized wherever possible to avoid any conflict between them." *Wallace,* 972 P.2d at 448. The perceived conflict, however, was not a conflict between state and federal law, but rather one between different provisions of the federal Medicaid statute. *Wallace* treated the anti-lien provisions of 42 U.S.C. § 1396p(a)(1) as potentially conflicting with the mandate that states collect sufficient information to enable them to "seek reimbursement from third parties." *Id.* (citing 42 U.S.C. § 1396a(a)(25)(A)). Congress, the reasoning went, could not have intended that

the anti-lien provision would interfere with collection efforts against liable third parties:

> Congress could not have intended to prohibit or inhibit third-party recoveries which it directed in the same Social Security Act.... [The anti-lien provision] has coexisted for many years with 42 U.S.C. § 1396a(a)(25)(A), a sister section in the Act, which mandates states to seek reimbursement from third parties who are legally liable for the medical payments.

*Wallace,* 972 P.2d at 448. If the third-party liability recognized in a judgment or settlement remains the property of the third party, then it can be the subject of the state's recovery efforts without violation of the anti-lien provisions.

¶ 33 *Wallace's* resolution of the potential conflict between obligations to collect reimbursement and to protect some of the recipient's assets did accomplish the goal of harmonizing federal provisions with each other, but it did not address the more important issue of federal goals and state law, required by preemption analysis. As explained above, the federal provisions can more properly be harmonized by looking to their plain meaning, and without reference to state law. Federal assignment provisions require a recipient to assign claims for medical care to the state as a condition of eligibility for Medicaid. Once these claims are assigned, they are no longer the property of the recipient, but of the agency to whom they are assigned. In pursuing the liability of third parties for medical expenses, or in enforcing a lien on proceeds payable by a third party for medical expenses, the state is enforcing its own property rights and not those of the recipient, who has already assigned them to the state.

¶ 34 The Minnesota Supreme Court has recently adopted this interpretation of the federal law and its preemptive implications

---

federal anti-lien provision and is thus subject to preemption.

9. Treating the statutory judgment lien provisions as a real-property exception to the rule that a judgment creates no property interest in the subject matter of the judgment would lead to arbitrary results. It seems most unlikely that the legislature intended that the victim of a tortfea-

sor whose primary assets are real property should obtain a property interest (protected by the federal anti-lien statute) in the subject matter of a judgment, while the victim of a tortfeasor whose primary assets are personal property should obtain no property interest in the subject matter of a judgment (and thus no protection from the federal anti-lien statute).

relative to state law in *Martin v. Rochester*, 642 N.W.2d 1 (Minn.2002). The Minnesota court likens a tort victim's claims against a liable third party to a "bundle of sticks"; federal law requires that certain sticks in the bundle—certain causes of action arising out of the incident that created the need for medical assistance—be assigned to the state, but allows any other causes of action to remain the property of the recipient. *Id.* at 30.

¶ 35 The analogy to the bundle of sticks, familiar to students of property law, operates to harmonize federal collection provisions with the protections federal law creates for the assets of Medicaid recipients. Federal assignment requirements do not, under this approach, conflict with the anti-lien provision because the event that gives rise to a need for medical care also creates multiple rights. While federal law requires that a Medicaid recipient assign the state *all rights to recover for medical expenses* from any liable third party, the recipient retains all rights to recover for any other damages:

> [T]he state becomes the sole owner of the claim against any third parties for medical expenses. But the recipient retains ownership of the remaining sticks in the bundle—that is to say, the claims for pain and suffering, emotional distress, disability, disfigurement, loss of earnings, and loss of earning capacity.

*Martin,* 642 N.W.2d at 30–31. State laws providing for liens on that portion of a settlement or judgment designated for medical expenses do not conflict with federal anti-lien provisions because the rights to these proceeds have been completely assigned to the state and are thus no longer a recipient's property.[10] State liens on proceeds designated for damages other than medical expenses

violate the federal prohibition on liens since those proceeds have not been assigned and thus remain the recipient's property.

¶ 36 The property created by a third party's liability is not a single, undifferentiated mass, nor is a recipient's claim on any element of that property necessarily identical to her claim on any other element. The *Martin* court rejects the analysis in cases such as *S.S.* and *Wallace* because of their unwillingness

> to recognize that a personal injury tort action against potentially liable third parties comprises more than a right to recover for medical expenses. The tort action includes claims for pain and suffering, emotional distress, loss of earnings, and other familiar tort claims. The part of any settlement attributable to these unassigned claims is the property of the medical assistance recipient during his life, and the state has no right to these claims under the assignment. So while the … [Utah court is] correct in … [its] conclusion … that a recovery for medical expenses is not the property of a medical assistance recipient … [it] ignore[s] the part of the recovery or settlement for claims other than medical expenses.

*Martin,* 642 N.W.2d at 23–24. The *Martin* court links the federal assignment and collection provisions: it is only claims for medical expenses that have been assigned and it is only proceeds of claims for medical expenses that the state can collect. The state obtains the right to precisely what has been assigned; the federal anti-lien provision prevents the state from acquiring a broad and undifferentiated right to collect its reimbursement from any other proceeds payable by the third party to the recipient.

10. Even the assignment of rights *to payments for medical expenses* may not be as complete as the Minnesota Court suggests, since 42 U.S.C. § 1396k(b) requires that if the amount the state collects under the assignment provisions of § 1396k(a)(1)(A) exceeds amounts expended by the state and federal governments, "the remainder of such amount collected shall be paid to such individual." 42 U.S.C. § 1396k(b) (1992). While it is no doubt unusual for the state to collect an amount in excess of its expenditures, the provision is of some use in discerning the extent to which the assignment of rights, even to collect for medical expenditures, is complete; the recipient retains some interest in the claim to medical expenses even after assigning the right to collect to the state. The very structure of Utah's law suggests a tacit recognition that the recipient retains some right to pursue third parties even for medical expenses: "the assignment [of the right to third party-payments for medical expenses] was not exclusive, as evidenced by Medicaid's willingness to allow recipients to pursue third-party recovery actions independently…. [The recipient] still retained the right to sue for and receive third-party payments…." *Wallace,* 972 P.2d at 450 (Durham, J., dissenting).

¶ 37 A sweeping and indiscriminate right to third-party payments, rejected by the *Martin* court, is precisely what the majority today creates. If the rights assigned and retained by a recipient are not differentiated, then a state may obtain reimbursement even from payments designated for causes of action and damages other than those for medical expenses. The court today reaches the conclusion that because our precedent allows liens on settlement proceeds, "a *priority* lien on a recipient's third-party settlement proceeds does not encumber the recipient's property, even if those proceeds include compensation for nonmedical claims." (emphasis added). The measure of the state's recovery thus becomes the state's expenditures, not the amount of the third party's liability. This result is not compelled by our precedents; even if third-party payments remain the property of the third party until after Medicaid is reimbursed, it does not necessarily follow that *all* third-party payments, however designated, may be used to reimburse the state.

¶ 38 Two years ago this court addressed the *extent* to which the state can recover its expenditures against settlement proceeds. *See Office of Recovery Servs. v. McCoy,* 2000 UT 39, 999 P.2d 572. While the majority's language might appear to give the state the right to satisfy its lien against the *entire* proceeds payable to the recipient, the holding should be restricted to its facts, and its language should not be over-read. In *McCoy* the court read the state lien provision as giving the state "a lien against the entire settlement proceeds, including both the amount designated as medical payment and the amount designated as bodily injury payment." *Id.* at ¶ 12. What is comprehended in a settlement for "bodily injury" is difficult to define, and may be virtually indistinguishable from payment for medical expenses. Because a payment for bodily injury may include, and, indeed, may be limited to, payments for medical expenses, *McCoy* need not be read to compel the holding that claims for damages not assigned to the state—and not required to be assigned to the state—and clearly designated as payments for damages other than medical expenditures, can be the subject of a state lien to recover Medicaid expenditures.

¶ 39 Not only do our precedents not require the conclusion that all third-party settlements are available in their entirety to satisfy state claims for Medicaid reimbursement, there is in fact support in our case law for the proposition that the recipient retains some claims—and some rights to payment— despite *state* assignment provisions. The majority opinion in *Wallace* holds that harmony between the federal assignment and anti-lien provisions may be achieved "if *that part of the insurance proceeds assigned . . .* [by the recipient] to the state are considered to not be . . . [the recipient's] property. . . ." *Wallace,* 972 P.2d at 448 (emphasis added). Our precedent recognizes that only *some* of the proceeds, only *some* of the rights to payment, are assigned to the state, and that those rights that are not assigned are retained by the recipient. If only a part of the insurance proceeds is assigned to the state, the state cannot collect against payments flowing from those rights retained by the recipient.

¶ 40 Even if our precedent to the effect that state liens on third-party payments do not violate federal anti-lien provisions is correct, the conclusion that the state's lien must be satisfied to its full extent before the recipient may have any interest in the payments does not necessarily follow. The state has an interest in property in the hands of a third party because of the relationship between that third party and the recipient; the relationship that creates the state's interest may be construed as limiting the extent of the state's interest. An analogy to the rules governing garnishment illustrates the point: having a right to property in the hands of a third party does not necessarily create an entitlement to the entire obligation owed by the third party. Utah Rule of Civil Procedure 64D governs garnishment, the process by which debts and other obligations owed by a third party to a debtor may be reached by the debtor's creditors. The fact that garnishment provides a means by which third-party obligations may be reached, however, does not mean that the circumstances of the relationship between debtor and garnishee may be ignored. The right of setoff embodied in Utah Rule of Civil Procedure 64D(m) demonstrates the continuing importance of the relationship between debtor and garnish-

ee in determining the extent of the garnishor's right to be satisfied from the third party's property. Possession of a lien includes no guarantee of its full satisfaction.

¶ 41 The state Medicaid provisions on which we relied in *McCoy* are not completely without ambiguity. Utah law provides that

the department may recover in full from the recipient or any party to which the proceeds [11] were made payable all medical assistance which it has provided and retains its right to commence an independent action against the third party. . . .

Utah Code Ann. § 26–19–7(2)(b) (1998). Whether or not this provision guarantees *full* reimbursement depends on the construction placed on the word "may." "May" can either suggest that it is possible that the state will recover its expenditures in full or that the state is invariably allowed to recover in full. While nothing in the statute compels the interpretation that a full recovery is only a permissible, not an inevitable, outcome, it is equally true that the statute does not require the result the court reaches today.

## CONCLUSION

¶ 42 Our precedent and the approach adopted by the Minnesota Supreme Court both purport to harmonize competing obligations imposed by federal law. The majority in *Wallace* supported the proposition that third-party payments remain the property of the third party until after Medicaid has been reimbursed *primarily* with the principle that "sections of a statute should be harmonized so as to avoid any conflict between them." *Wallace*, 972 P.2d at 448 (emphasis added). That interpretation is not necessary to the harmonization of the statute, however. The better approach, and the one I believe is required by the federal preemption principles discussed herein, suggests that a court's "primary function" in determining if state law is preempted by federal law is to deter-

mine whether state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941). A reimbursement scheme that eviscerates the federal purpose of shielding some recipient assets from state collection efforts is incompatible with the protection for recipients evident in the federal scheme.[12] The analytical model this court has adopted in the past and extends today does not properly account for congressional intent and the operation of preemption; it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* The model recently adopted by the Minnesota Supreme Court harmonizes federal purposes with state law in a far more logical, supportable, and fair manner than the path chosen by the majority.

---

**11.** Because the statute does not define proceeds, it is possible that this and other portions of state law (including the lien provisions of Utah Code Ann. § 26–19–5(1)(b)) could be saved from preemption by a judicial interpretation of proceeds that restricts the term's meaning in this context to recovery for medical expenditures alone.

**12.** The anti-lien provision, the creation of supplemental needs trusts (which allow assets to be held in trust for the medical and other needs of the recipient without defeating Medicaid eligibility), 42 U.S.C. § 1396p(d)(4)(A) (Supp.2002), and provisions mandating the return to the recipient of amounts in excess of state and federal expenditure all underline Congress' intention both to protect recipients' assets from state claims for reimbursement and to protect recipients from ineligibility resulting from an overabundance of assets.