2002 UT 32

**WATER & ENERGY SYSTEMS TECHNOLOGY, INC., Plaintiff, Appellee, and Cross–Appellant,**

v.

**Steven L. KEIL and Brody Chemical Company, Inc., Defendants, Appellants, and Cross–Appellees.**

No. 20000468.

Supreme Court of Utah.

March 19, 2002.

Rehearing Denied May 3, 2002.

Joseph C. Rust, Salt Lake City, for plaintiff.

John T. Caine, Ogden, for Keil.

Thomas R. Blonquist, Salt Lake City, for Brody Chemical.

RUSSON, Associate Chief Justice.

¶1 Steven L. Keil and Brody Chemical Company appeal from a trial court judgment awarding Water & Energy Systems Technology, Inc., $188,675 in damages for its claims of (1) intentional interference with existing and prospective business relations and (2) misappropriation of trade secrets pursuant to the Uniform Trade Secrets Act, Utah Code Ann. §§ 13–24–1 to –9 (1999). We affirm.

## BACKGROUND

¶2 "On appeal from a jury verdict, we view the evidence and all reasonable inferences drawn therefrom in the light most favorable to that verdict." *Pratt v. Prodata, Inc.*, 885 P.2d 786, 787 (Utah 1994); *see also Kilpatrick v. Wiley, Rein & Fielding*, 2001 UT 107, ¶2, 37 P.3d 1130.

¶3 Steven Keil ("Keil") began working for Water & Energy Systems Technology, Inc. ("WEST"), as a water treatment chemical sales representative in 1986. During his tenure at WEST, Keil spent the majority of his time managing and servicing certain of the company's industrial sales accounts, including those for Alliant Techsystems ("Alliant"), Cargill Flour Milling ("Cargill"), Magnesium Corporation of America ("MagCorp"), and Utah State University ("USU"). As part of his duties related to these accounts, Keil had access to the formulae WEST used to create its chemicals, as well as to WEST's confidential, customer-specific pricing lists for those chemicals.[1]

¶4 Subsequently, in September 1997, representatives of Brody Chemical Company ("BCC") approached Keil about the possibility of his leaving WEST to work for BCC. Keil initially declined this invitation, deciding instead to stay with WEST. After further discussions, however, Keil agreed in late 1997 to begin selling for BCC water treatment chemicals similar to those he was marketing for WEST.

¶5 In preparation for his departure from WEST, Keil began meeting with various employees of BCC, including the company's owner, Jon Liddiard. The purpose of these meetings was to ensure that BCC carried an inventory of treatment chemicals comparable to those marketed by WEST, and to establish a pricing scheme for the chemicals that would be "competitive" with WEST's pricing. Accordingly, the discussions at Keil's meetings with BCC centered around the necessary "[f]ormulations" for the chemicals, how and "where to obtain [the] raw materials" required by the formulae, and possible "pricing" for the ultimate products. Specifically, BCC and Keil worked to create products that would be "equivalent" to WEST's but that would be sold for "ten percent less" than the confidential prices charged by WEST to each respective customer.

¶6 Following these preparatory meetings, on February 18, 1998, Keil drafted on BCC stationery six substantively identical letters to the various clients he had been servicing for WEST, including Alliant, Cargill, MagCorp, and USU. In the letters, Keil explained that he had begun working for BCC and that because of this change in employment, he could now offer "essentially the same" chemicals he had provided before but at "substantially lower" prices. In support of this contention, Keil's letters to Alliant, Cargill, and USU each included a table that juxtaposed the proposed prices of BCC's

---

1. WEST attempted to ensure the confidentiality of its customer-specific price lists in a number of ways. The company provided prices to its sales representatives only on a "need to know basis." Likewise, WEST instructed its sales personnel to always inform customers that any pricing information they received was confidential. Finally, all written disclosures of WEST prices to the company's customers was accompanied by language that read in substance, "This material is proprietary and confidential. We honor your commitment to maintain it as such."

treatment chemicals with the prices of WEST's "corresponding" chemicals. The prices listed for BCC's chemicals represented approximately a ten percent discount from WEST's prices.

¶ 7 Shortly thereafter, on March 2, 1998, Keil voluntarily terminated his employment with WEST. The next day, Keil began delivering the letters he had written to the clients he serviced while at WEST. Within two weeks of the delivery of these letters, Alliant, Cargill, and MagCorp all ceased ordering water treatment chemicals from WEST despite the fact that WEST had serviced each company continuously for the previous four years and WEST "had every expectation" of maintaining those relationships. Moreover, two of these companies, Alliant and Cargill, immediately began purchasing their water treatment chemicals from BCC. Similarly, MagCorp reported to WEST that it was terminating their relationship based in part on "problems with [its service] representative," Keil.

¶ 8 On March 9, 1998, WEST sued BCC and Keil (collectively, "defendants") in the Second District Court for Davis County, alleging among other things that Keil had intentionally interfered with WEST's "existing and future business relationships for improper purposes," and had misappropriated WEST's confidential prices by sharing them with BCC in violation of the Uniform Trade Secrets Act, Utah Code Ann. §§ 13–24–1 to – 9 (1999). On March 26, 1998, the district court granted WEST a preliminary injunction against BCC and Keil, which we reversed on interlocutory appeal in *Water & Energy Systems Technology, Inc. v. Keil,* 1999 UT 16, 974 P.2d 821 (*"Keil I "*).

¶ 9 Following our decision in *Keil I,* defendants moved for summary judgment, asserting in part that Keil had not misappropriated WEST's price lists as a matter of law. The district court, however, denied the motion on this issue in an order dated September 1, 1999. The court reasoned:

> There is sufficient evidence from which the trier of fact could conclude that the ... price lists of [WEST] were confidential.... [Therefore,] [t]here remains a question of fact as to the misappropriation

of [WEST]'s price lists and as to whether [WEST]'s price lists were used by [BCC and Keil] in establishing [BCC]'s prices.

Accordingly, the case proceeded to trial.

¶ 10 At trial, defendants again urged the district court to enter judgment in their favor, moving for a directed verdict at the conclusion of WEST's case in chief on a number of grounds, including (1) that insufficient evidence had been introduced to establish WEST's claim for misappropriation of its price lists, (2) that insufficient evidence had been introduced to substantiate WEST's claim for intentional interference with its business relations for improper purposes, and (3) that WEST had failed to prove Keil's actions caused the company damages in regard to its contractual relationship with USU. Concluding that the jury could reasonably find in WEST's favor on the issue of misappropriation if it "chose to believe everything ... presented by way of [WEST]'s case"—and that a jury finding of misappropriation would satisfy the challenged "improper purpose" element of WEST's intentional interference with business relations claim—the district court denied defendants' motion on these two issues but granted the motion on WEST's claim for damages related to its USU account. The court stated, "[On] the element of damage having to do with USU[,] the Court finds that there is insufficient evidence to go to the jury ... and therefore will allow [WEST to proceed] only [on] those issues relative to the claim from Alliant, from MagCorp, [and] from Cargill."

¶ 11 At the conclusion of trial, the jury rendered a verdict in WEST's favor on both its intentional interference with business relations and misappropriation of trade secrets claims, awarding the company $188,675 of damages in lost profits and unearned salary and benefits that had been paid to Keil. Specifically, the jury found that WEST's price lists were confidential; that Keil had misappropriated WEST's price lists; that Keil intentionally interfered with WEST's business relationships with Alliant, Cargill, and MagCorp; that Keil's actions damaged WEST; and that Keil engaged in these actions as an agent of BCC.

¶ 12 Subsequently, on March 10, 2000, defendants moved for a new trial and for judgment notwithstanding the verdict, contending among other things that insufficient evidence had been introduced at trial to establish WEST's claim for misappropriation of its trade secrets, and that an incorrect standard for calculating damages had been used in the case. WEST responded, and on May 31, 2000, the trial court denied defendants' motions. Finding that sufficient evidence had been introduced at trial to prove Keil had disclosed WEST's respective price lists for Alliant, Cargill, and MagCorp in an effort to transfer that business to BCC, the court ruled that the "damages awarded by the jury were fair and reasonable." Defendants now appeal the judgment of the trial court.

## ANALYSIS

■ ¶ 13 On appeal, BCC and Keil raise two arguments: (1) that the trial court erred by failing to direct or set aside the jury verdict because, as defendants allege, WEST presented "insufficient evidence to support the jury's verdict" for its claim of misappropriation of trade secrets; and (2) that the trial court erred by refusing to set aside the damages awarded to WEST as an improper assessment of damages under the Uniform Trade Secrets Act.[2] In addition, WEST cross-appeals, claiming that the trial court inappropriately disallowed the company from seeking additional damages beyond those ultimately awarded by the jury. We address each issue in turn.

2. Apparently, defendants also argue that the jury's finding concerning the confidentiality of WEST's price lists was not supported by the evidence because Keil committed them to memory and because BCC could have obtained the prices by asking WEST's customers what they paid for their chemicals. Likewise, defendants contend that Keil's actions in this case could not have injured WEST because WEST's contracts with Alliant, Cargill, and MagCorp "were not adhesion or exclusive contracts and [the companies] were free to purchase other products and services at any time." These arguments, however, fail for at least three reasons. First, defendants have not adequately briefed these contentions, and we therefore will not address them. E.g., State v. Bishop, 753 P.2d 439, 450 (Utah 1988); Utah R.App. P. 24(a)(9); see also infra

## I. INSUFFICIENCY OF THE EVIDENCE

■ ¶ 14 BCC and Keil first contend that the trial court erred by denying their motions for directed verdict and for judgment notwithstanding the verdict because WEST failed to present sufficient evidence to establish a misappropriation of WEST's price lists. Specifically, defendants argue that the evidence presented at trial "did not purponderate [sic]" the jury's finding of either (1) Keil's disclosure of WEST's price lists or (2) "a nexus between the any [sic] activity of Keil [and] damage to WEST."

■ ¶ 15 When an appellant contends that the evidence presented at trial is insufficient to support a jury's factual findings, "we do not weigh the evidence de novo." In re Estate of Bartell, 776 P.2d 885, 886 (Utah 1989). Rather, we follow one standard of review: We reverse only if, taking the evidence in the light most favorable to the prevailing party, the appellant demonstrates that the findings lack substantial evidentiary support. Id.; see also Scudder v. Kennecott Copper Corp., 886 P.2d 48, 52 (Utah 1994); Heslop v. Bank of Utah, 839 P.2d 828, 839 (Utah 1992); Gustaveson v. Gregg, 655 P.2d 693, 695 (Utah 1982). Specifically, this standard obligates the appealing party to marshal all the evidence supporting the verdict and then show that such evidence "cannot support the verdict." Hansen v. Stewart, 761 P.2d 14, 18 (Utah 1988); see also, e.g., Brewer v. Denver & Rio Grande W. R.R., 2001 UT 77, ¶¶ 33–36, 31 P.3d 557; Seale v. Gowans, 923 P.2d 1361, 1363 (Utah 1996);

¶¶ 20–21. In addition, defendants do not even attempt to meet their marshaling burden on these arguments, and thus, we assume that the record supports the jury's findings in favor of WEST on these issues. E.g., State v. Hopkins, 1999 UT 98, ¶ 16, 989 P.2d 1065; Young v. Young, 1999 UT 38, ¶ 30, 979 P.2d 338. Finally, even a cursory review of the record reveals that ample evidence was presented at trial for the jury to find that WEST's price lists were confidential and expected their employees to keep them as such, that water treatment chemical prices are treated as confidential and proprietary within the industry as a general practice, and that WEST reasonably expected to continue its relationships with Alliant, Cargill, and MagCorp despite the nonexclusive nature of their contracts.

*Crookston v. Fire Ins. Exch.,* 817 P.2d 789, 799 (Utah 1991). Indeed, we employ this standard in light of our general deference toward the jury's role as fact-finder and our repeated recognition of trial courts' "advantaged position to evaluate the evidence and determine the facts." *Utah Med. Prods., Inc. v. Searcy,* 958 P.2d 228, 232 (Utah 1998); *see also, e.g., Willey v. Willey,* 951 P.2d 226, 230 (Utah 1997). Accordingly, when the appealing party does not meet its marshaling burden, we "assume that the evidence adequately supported the finding[s]," and the complaining party's assertion of insufficiency must therefore fail. *Young v. Young,* 1999 UT 38, ¶ 30, 979 P.2d 338; *see also, e.g., State v. Hopkins,* 1999 UT 98, ¶ 16, 989 P.2d 1065; *Searcy,* 958 P.2d at 233; *Interwest Constr. v. Palmer,* 923 P.2d 1350, 1360 (Utah 1996); *Hall v. Process Instruments & Control, Inc.,* 890 P.2d 1024, 1028 (Utah 1995); *Saunders v. Sharp,* 806 P.2d 198, 199 (Utah 1991).

¶ 16 In this case, defendants' brief contains a lengthy section purporting to marshal the evidence in favor of the jury verdict. However, although BCC and Keil do cite some evidence that supports the jury's findings, even a cursory review of the trial record reveals that defendants "frequently omit[ ] crucial and incriminating evidence" that weighs in favor of the jury's verdict. *Alta Indus. Ltd. v. Hurst,* 846 P.2d 1282, 1287 (Utah 1993). For example, defendants admit that Keil repeatedly met with employees of BCC prior to his departure from WEST, but they fail to address what occurred at those meetings: that BCC and Keil openly discussed prices in a joint effort to develop a plan to offer chemicals equivalent to WEST's at a ten percent discount from that company's prices. Similarly, defendants assert that when he departed from WEST, Keil "took no documents with him that set forth pricing," even though WEST's president specifically testified at trial that Keil never returned pricing sheets for a number of WEST's

clients, including Alliant and MagCorp, that were in his possession when he left WEST. Further, defendants maintain that pricing was not the "key" issue affecting WEST's loss of business as a result of Keil's actions, despite the fact that evidence was introduced at trial deeming pricing "important"; that Alliant, Cargill, and MagCorp all ceased purchasing chemicals from WEST following BCC's offers to provide equivalent chemicals at a ten percent discount; and that following such offers Alliant and Cargill immediately began purchasing their water treatment chemicals from BCC. Indeed, defendants' supposed marshaling of the evidence in reality only constitutes a reargument of the factual case they presented below, with the evidence construed in a light most favorable to BCC and Keil rather than to WEST. *See In re Estate of Bartell,* 776 P.2d at 886. By its very nature, such a tactic does not carry defendants' "heavy" marshaling burden, and we consequently will not disturb the jury's findings rendered in favor of WEST. *Alta Indus.,* 846 P.2d at 1286; *see also Young,* 1999 UT 38 at ¶ 30, 979 P.2d 338; *Searcy,* 958 P.2d at 232; *In re Estate of Bartell,* 776 P.2d at 886; *Scharf v. BMG Corp.,* 700 P.2d 1068, 1069–70 (Utah 1985).[3]

## II. MEASURE OF DAMAGES

■ ¶ 17 Defendants' second argument on appeal is that the trial court erred by refusing to set aside the damages awarded to WEST. Specifically, defendants argue that rather than allowing WEST to recover its lost profits caused by Keil's disclosure of its price lists, the trial court should have limited WEST's damages to the "benefit" BCC and Keil received as a result of misappropriation. We disagree.

■ ¶ 18 Section 13–24–4 of the Utah Code governs the amount of damages that may be awarded for the misappropriation of a trade secret. This provision states that damages available under the Act

---

**3.** We further note that, under other conditions, the jury's finding in favor of WEST on the company's claim for intentional interference with business relations would constitute independent grounds for affirmance. *See Crookston v. Fire Ins. Exch.,* 817 P.2d 789, 797–98 (Utah 1991).

However, because the trial court explicitly hinged the viability of this claim on WEST's misappropriation claim, we address defendants' insufficiency of the evidence argument on appeal regardless.

can include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss.

Utah Code Ann. § 13–24–4(1) (1999). When interpreting a legislative enactment, "we look first to the plain language of the act to determine its meaning." *City of Hildale v. Cooke,* 2001 UT 56, ¶ 36, 28 P.3d 697; *see also, e.g., State ex rel. Div. of Forestry, Fire & State Lands v. Tooele County,* 2002 UT 8, ¶ 10, 44 P.3d 680; *Associated Gen. Contractors v. Bd. Oil, Gas & Mining,* 2001 UT 112, ¶ 27, 38 P.3d 291; *Hall v. Utah State Dep't of Corr.,* 2001 UT 34, ¶ 15, 24 P.3d 958; *Jensen v. Intermountain Health Care, Inc.,* 679 P.2d 903, 906 (Utah 1984). In this case, the plain language of section 13–24–4 is entirely antithetical to the position advanced by BCC and Keil. Rather than restricting damages in misappropriation cases to the windfall obtained by the defendant, section 13–24–4 unambiguously states that such damages "can include *both* the actual loss caused by misappropriation *and* the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss." Utah Code Ann. § 13–24–4(1) (emphasis added). Indeed, this language specifically contemplates—in two separate places—that a successful plaintiff in a misappropriation case may obtain the losses it suffers due to the disclosure of its trade secret. *See id.* Accordingly, we reject defendants' argument that damages for the misappropriation of a trade secret must be restricted to the unjust enrichment such disclosure renders, and thus, hold that the trial court did not err in this case by allowing WEST to recover its lost profits caused by BCC and Keil. *See id.*

### III. ADDITIONAL DAMAGE CLAIMS

■ ¶ 19 Finally, WEST contends on cross-appeal that the trial court erred by disallowing the company from seeking additional damages beyond those ultimately awarded by the jury. Specifically, WEST asserts that it is "entitle[d]" to "double damages and attorney[ ] fees" for Keil's "malicious and willful . . . misuse of WEST's trade secrets," and to "additional damages [derived from] Keil's interference with WEST's USU account." In making this assertion, however, WEST fails to adequately set forth an argument as required by rule 24(a)(9) of the Utah Rules of Appellate Procedure.

¶ 20 This court has repeatedly held that appealing parties must " 'clearly define[ ]' " the issues presented on appeal " 'with pertinent authority cited.' " *State v. Bishop,* 753 P.2d 439, 450 (Utah 1988) (quoting *Williamson v. Opsahl,* 92 Ill.App.3d 1087, 48 Ill.Dec. 510, 416 N.E.2d 783, 784 (1981)). Likewise, Utah Rule of Appellate Procedure 24 unequivocally requires, "[Appellant's brief] shall contain the contentions and reasons of the appellant with respect to the issues presented, including . . . citations to the authorities, statutes, and parts of the record relied on." Utah R.App. P. 24(a)(9). Consequently, "[i]t is well established that a reviewing court will not address arguments that are not adequately briefed." *State v. Thomas,* 961 P.2d 299, 304 (Utah 1998); *see also, e.g., Ellis v. Swensen,* 2000 UT 101, ¶ 17, 16 P.3d 1233; *Coleman v. Stevens,* 2000 UT 98, ¶ 7, 17 P.3d 1122.

■ ¶ 21 In this case, WEST has entirely failed to adequately brief its assertion that it is "entitled" to additional damages. WEST does not offer even a single statutory citation, judicial decision, or procedural rule in support of its claim for further damages. *See, e.g., Associated Gen. Contractors v. Bd. Oil, Gas, & Mining,* 2001 UT 112, ¶ 37, 38 P.3d 291; *State v. Bisner,* 2001 UT 99, n. 5, 37 P.3d 1073; *Featherstone v. Schaerrer,* 2001 UT 86, n. 11, 34 P.3d 194. Indeed, WEST baldly asserts it is "clear from trial court testimony" that the company is due additional damages, but WEST fails to refer us to even one location in the record where such evidence exists. Moreover, WEST utterly neglects to discuss, let alone construe or apply, the Uniform Trade Secrets Act's provisions on damages and attorney fees—statutory language that would certainly be determinative, if not dispositive, of whether WEST qualifies for the damages it seeks. *See* Utah Code Ann. §§ 13–24–4 to –5. Such an approach is neither adequate under the Utah Rules of Appellate Procedure nor acceptable. Accordingly, because WEST has

not sufficiently presented its claim for additional damages, we will not address the argument. *E.g., Ellis,* 2000 UT 101 at ¶ 17, 16 P.3d 1233; *Coleman,* 2000 UT 98 at ¶ 7, 17 P.3d 1122; *Thomas,* 961 P.2d at 304. As we have all too often[4] had occasion to explain, this court will not become " 'simply a depository in which the appealing party may dump the burden of argument and research.' " *Bishop,* 753 P.2d at 450 (quoting *Opsahl,* 48 Ill.Dec. 510, 416 N.E.2d at 784). We once again refuse to accept that role.

## CONCLUSION

¶ 22 In view of the foregoing, we conclude that the trial court did not err by (1) refusing to set aside the jury's verdict based on defendants' claims of insufficiency of the evidence and inappropriately assessed damages or by (2) disallowing WEST from seeking additional damages beyond those awarded by the jury. Accordingly, we affirm the judgment of the trial court as entered below.

¶ 23 Chief Justice HOWE, Justice DURHAM, Justice DURRANT, and Justice WILKINS concur in Associate Chief Justice RUSSON'S opinion.

---

4. *See Associated Gen. Contractors,* 2001 UT 112 at ¶ 37 & n. 8, 38 P.3d 291 (listing twenty-three cases in which a party inadequately briefed an argument); *MacKay v. Hardy,* 973 P.2d 941, 948 n. 9 (Utah 1998) (giving examples of the "discon-certingly legion" number of inadequately briefed cases); *see also Tanner v. Carter,* 2001 UT 18, ¶ 42, 20 P.3d 332; *Coleman,* 2000 UT 98 at ¶ 7, 17 P.3d 1122.