2005 UT App 477

**Elizabeth Ruth MUELLER aka Elizabeth Muller fka Elizabeth Ruth M. Allen, Plaintiff and Appellee,**

v.

**David G. ALLEN, Susan S. Allen, Randy N. McCandless, and Halene McCandless, Defendants and Appellants.**

**No. 20040208–CA.**

Court of Appeals of Utah.

Nov. 3, 2005.

Mary C. Corporon, Corporon Williams & Bradford, Salt Lake City, for Appellants.

Gary A. Weston, Nielsen & Senior PC, Salt Lake City, for Appellee.

Before Judges DAVIS, GREENWOOD, and ORME.

## OPINION

ORME, Judge:

¶ 1 This appeal stems from a divorce between David Allen and Elizabeth Mueller and concerns the post-divorce use and disposition of David and Elizabeth's property in Riverton, Utah. Susan Allen, David's mother, was joined as a defendant because she was a real estate agent that dealt with the property. A jury found that David and Susan Allen, by renting it to the McCandless family, trespassed upon Elizabeth's right to occupy, possess, and use the property. The Allens now appeal portions of the jury's verdict. We affirm in part and reverse in part.

## BACKGROUND

¶ 2 While most of the pertinent facts are not in dispute, " '[o]n appeal from a jury verdict, we view the evidence and all reasonable inferences in a light most favorable to that verdict and recite the facts accordingly.' " *State v. Allen*, 2005 UT 11, ¶ 2, 108 P.3d 730 (citation omitted).

¶ 3 David Allen and Elizabeth Mueller were married in November of 1998. Approximately one year after they were married, they purchased a "fixer-upper" in Riverton, Utah, taking title as co-owners and each holding a one-half undivided interest in the home. During their marriage, they placed a first and second mortgage on the home and paid the monthly mortgage payments from a

common bank account. They separated in August of 2001. Elizabeth remained in the home until the parties divorced in January of 2002. Until that time, Elizabeth and David had duly made their mortgage payments, but when Elizabeth moved out of the home in January of 2002, they stopped making payments. They also stopped making utility payments, and Elizabeth and her father "winterized" the home. The divorce court entered its decree in January 2002, which, among other things, ordered Elizabeth and David to sell their home "as soon as reasonably practicable" and divide the proceeds "equally."

¶ 4 Approximately nine months before David and Elizabeth divorced, the couple had put their home up for sale. They retained David's mother, Susan Allen, a real estate agent, to sell their home. They signed a listing agreement securing Susan's services from April through September of 2001. No buyer was procured during that time and a second listing agreement was signed that expired March 22, 2002. Both listing agreements provided that the home was not available to rent.

¶ 5 Up until March 2002, prospective buyers had come by to look at the home, but not a single offer to purchase the home had been made. In early March of 2002, Susan showed the home to the McCandlesses, who, after inspecting the property, decided to purchase the home at a price that reflected its current state of repair—or more accurately, disrepair. The purchase was conditioned upon the McCandlesses' ability to secure a loan for the entire purchase price. When Elizabeth signed the earnest money agreement for the potential sale of the home to the McCandlesses, she expressed concern to Susan about the property, about her credit, and about the property going into foreclosure because she and David had not made a mortgage payment since December 2001. Elizabeth inquired about putting renters into the property if the McCandlesses' application for a loan was denied. Susan advised against renting the property at that time.

¶ 6 The McCandlesses' loan application was in fact denied, and they did not then purchase the home. On April 5, 2002, however, David and the McCandlesses signed a residential rental agreement by which the McCandlesses rented the property for $1400 per month, provided that they could secure a loan with which to purchase the property within thirty days. Susan, who had prepared the residential rental agreement, faxed it to Elizabeth. Elizabeth did not sign the agreement, later testifying that she believed that putting renters into the property would hinder the sale of the home. Nonetheless, the McCandlesses moved into the home that same day, and David collected $1400 from them to cover April's rent. David subsequently applied $550 of April's rent to the mortgage lender to forestall commencement of foreclosure proceedings, but failed to allocate to Elizabeth her fair share of the remaining $850.

¶ 7 That same night, Elizabeth visited the property to ask the McCandlesses about their understanding of the rental agreement. On arriving at the property, Elizabeth approached Mr. McCandless and informed him that she had not consented to the rental agreement and therefore had not signed it. She did not, however, ask him to vacate the property. Over the course of the next few months, she visited the property several more times and at no time during those visits did she ask the McCandlesses to vacate.

¶ 8 On April 26, 2002, Elizabeth was presented with another earnest money agreement signed by the McCandlesses, which conditioned their purchase obligation upon bank approval of their loan application. Elizabeth signed this contract, later testifying that her "ultimate goal ... was to sell the property and save [her and David's] credit." A few weeks later, the McCandlesses learned their loan application was again denied, leaving them without the means to purchase the property.

¶ 9 Although the McCandlesses continued to occupy the property beyond April of 2002, Elizabeth and David did not collect any rent from them during the next four months. During this entire time, Elizabeth did not ask the McCandlesses to vacate the property, nor did she indicate that she wanted to use or occupy the property. It was not until August 2002 that she made written demand

on the McCandlesses to vacate the property and to account for all rent that had been paid to David. Elizabeth, through her attorney, also sent a letter to Susan and David requesting that they advise Elizabeth whether any rent had been collected and, if none had been, that they evict the McCandlesses. Neither David nor Susan responded to the letter.

¶ 10 On August 23, Elizabeth served the McCandlesses with a written notice to pay the delinquent rent or quit their possession of the property. The McCandlesses continued to remain in possession. In September of 2002, David collected $2800 in rent from the McCandlesses—the first rent collected since April. In the meanwhile, the McCandlesses had not signed another earnest money agreement or rental agreement, nor had Elizabeth attempted to find a realtor to relist the property for sale.

¶ 11 On September 26, Elizabeth filed this action against David, Susan, and the McCandlesses alleging, among other things, that the Allens had trespassed upon her right to occupy, use, and possess the property by renting the property to the McCandlesses and that the Allens had tortiously interfered with her economic relations.

¶ 12 In November 2002, David collected another $1400 in rent from the McCandlesses. David later testified that he did not pay any portion of the rent he collected in September and November to Elizabeth. The McCandlesses finally obtained a loan and purchased the property in December of 2002 pursuant to an earnest money agreement prepared by David. To effectuate the sale, Elizabeth executed and delivered a quit claim deed to David.

¶ 13 In February 2003, David and Susan Allen filed a motion for partial summary judgment, arguing that the divorce court had continuing and exclusive jurisdiction over Elizabeth's claims against them. In May, the trial court ruled that the divorce court did not have exclusive jurisdiction over the matter. The Allens renewed their motion for partial summary judgment, which the court again denied. The case was then tried before a jury in January of 2004.

¶ 14 The jury found that both David and Susan intentionally interfered with Elizabeth's economic relations regarding the home, and awarded $8100 in compensatory damages against David and $0 in compensatory damages against Susan for the tortious interference. The jury also found that David and Susan had trespassed against Elizabeth's right to possession of the home by causing the McCandlesses to move into the home. On the trespass issue, the jury awarded compensatory damages against David and Susan Allen jointly and severally for $10,000. The jury further found that the McCandlesses had trespassed upon Elizabeth's right to occupy the home and that they had become unlawful detainees of the home. The jury awarded compensatory damages in the amount of $8,550, jointly and severally, against the McCandlesses. The special verdict of the jury on punitive damages awarded punitive damages of $5,000 against David and $30,000 against Susan.

¶ 15 The Allens now appeal. The McCandlesses did not appeal the jury's verdict against them.

## ISSUES AND STANDARDS OF REVIEW

¶ 16 The Allens argue that this matter never should have been brought as a separate lawsuit because Elizabeth's claims should have been raised in the prior divorce action. Because they were not, the Allens contend the claims should be barred by res judicata and collateral estoppel. They argue that the trial court also erred in ruling that the divorce court did not have exclusive jurisdiction over Elizabeth's claims. Because "summary judgment involve[s] questions of law," we review it "for correctness and accord the district court's decision no deference." *Houghton v. Department of Health*, 2002 UT 101, ¶ 7, 57 P.3d 1067.

¶ 17 The Allens also argue that the trial court improperly instructed the jury on trespass. They contend that they were unable to commit trespass as a matter of law and, therefore, that the verdict and instructions to the jury were in error. "Whether a jury instruction correctly states the law presents a question of law which we review for cor-

rectness." *State v. Houskeeper*, 2002 UT 118,¶ 11, 62 P.3d 444.

¶ 18 Finally, the Allens contend that much of the jury's verdict was unsupported by the evidence and cannot stand as a matter of law. " 'On appeal from a jury verdict, we view the evidence and all reasonable inferences drawn therefrom in the light most favorable to that verdict.' " *Water & Energy Sys. Tech., Inc. v. Keil*, 2002 UT 32,¶ 2, 48 P.3d 888 (citation omitted).

## ANALYSIS

¶ 19 We must first determine whether the trial court erred in denying the Allens' motion for partial summary judgment and in ruling that the divorce court did not have exclusive jurisdiction over this dispute, which concerns the disposition of a marital asset dealt with in the divorce decree. The answer to this question also largely resolves their res judicata argument.

### A. Jurisdiction

¶ 20 The Allens first argue that the divorce court had exclusive jurisdiction to resolve all disputes between David Allen and Elizabeth regarding their marital property. Indeed, the statutory provision relevant to this argument gives the divorce court "continuing jurisdiction to make subsequent changes or new orders . . . for the distribution of the [marital] property and obligations for debts as is reasonable and necessary." Utah Code Ann. § 30–3–5(3) (1998). This provision ensures that the court can enforce its orders concerning the distribution of property and, when new circumstances arise, the divorce court has jurisdiction to modify a divorce decree if it deems it is "reasonable and necessary" to do so. *Id.* See *Throckmorton v. Throckmorton*, 767 P.2d 121, 123 (Utah Ct.App.1988).

¶ 21 While it has been noted that "[t]he enforcement of a judgment for alimony or a division of property is normally a continuation of the original suit and therefore need not rest upon a new assertion of personal

jurisdiction over the defendant," 2 Homer H. Clark, Jr., *The Law of Domestic Relations in the United States* § 17.7, at 296 (2d ed.1987), it does not follow that one who prefers to bring an independent action to assert a claim arising from a divorce decree is not free to do so. *Cf. Zent v. Zent*, 281 N.W.2d 41, 45 (N.D.1979) ("Although the district court in which an action is litigated has continuing jurisdiction to modify its judgment in a divorce action upon a showing of changed circumstances, it does not have exclusive jurisdiction over all subsequent new causes of action that may be commenced to enforce or interpret the original decree.") (citation omitted). Indeed, the Allens do not cite any authority, and we are not aware of any, holding that section 30–3–5(3) operates to vest *exclusive* jurisdiction in the divorce court over all matters raised between the parties concerning their marital property and their debts.

¶ 22 Moreover, Elizabeth did not try to modify the divorce decree. Rather, she brought claims against Susan Allen and the McCandlesses, who were not parties to the divorce, as well as against David Allen. The divorce decree simply ordered David and Elizabeth to sell the property "as soon as reasonably practicable." Regrettably, in retrospect, it did not order the home to be sold in a certain manner nor by a particular person.[1] The claims Elizabeth brought against David and Susan Allen were never addressed by the court in the divorce action, were not covered by the divorce decree, did not attempt to modify the decree, and involved defendants who were not parties to the divorce action. Thus, while seeking relief from the divorce court was surely an option available to Elizabeth, the divorce court did not have exclusive jurisdiction over this dispute.

### B. Res Judicata

¶ 23 The Allens' argument that the divorce decree was a final order, and therefore that Elizabeth's claims of trespass and interference with economic relations are barred by res judicata and collateral estop-

---

1. Only two other provisions in the divorce decree specifically address the home. One gives a physical description of the property and the other

describes how the proceeds of the sale should be distributed.

pel, is similarly without merit. In order for a party to invoke the protection of either res judicata or collateral estoppel, the original suit or action must have resulted in a final judgment on the merits of an issue or claim that a party is seeking to relitigate. *See Brigham Young Univ. v. Tremco Consultants, Inc.*, 2005 UT 19,¶¶ 26–27, 110 P.3d 678 (listing requirements for res judicata and collateral estoppel to apply).

¶ 24 The Allens contend that the divorce decree was a final judgment on the merits that resolved all issues regarding how the parties were to handle the sale of the marital property. On the contrary, the divorce decree provisions were very vague regarding the sale of the marital property. As mentioned above, no judgment was made or directive given as to how the property should be sold or by whom it should be sold. Nor did the decree address any of the elements of trespass or interference with economic relations. Rather, the decree only ordered David and Elizabeth to sell the property "as soon as reasonably practicable." Thus, the decree cannot be considered a final judgment on the merits so as to bar Elizabeth's post-decree claims of trespass and interference with economic relations.

### C. Trespass

¶ 25 The Allens next argue that, as a matter of law, neither of them could have trespassed upon Elizabeth's right to enjoy and possess the home. Thus, they argue that the jury's verdict, which is premised upon a finding of trespass by both David and Susan Allen, is in error.

¶ 26 Joint tenants each have the right to "free and unobstructed possession and enjoyment" of the jointly held property. *Utah Oil Ref. Co. v. Leigh*, 98 Utah 149, 96 P.2d 1100, 1102 (1939). *See also* 7 Richard R. Powell, *Powell on Real Property* § 51.03[2], at 51–14 (Michael Allan Wolf ed., 2005) ("[E]ach co-owner is entitled to possess and enjoy the entire estate."); 20 Am.Jur.2d *Cotenancy and Joint Ownership* § 42 (2005) ("[A] cotenant of real property may use and enjoy the common estate . . . as though he or she were the sole proprietor."). Included in the right to possess and enjoy the property is the right to lease an interest in the property to a third party. 20 Am.Jur.2d *Cotenancy and Joint Ownership* § 101 (2005) ("Any of the cotenants may lease his or her undivided interest in the common property, either with or without the consent of the other cotenants.") (footnote omitted). "Such a lease, whether it be of the property generally, or specifically of the lessor's undivided interest, confers upon the lessee the lessor's full right to occupy and enjoy the premises." *Id.* (footnote omitted).

¶ 27 "Since each cotenant has a legal right to enter upon and enjoy the common property, trespass cannot ordinarily be maintained by one co-owner of real property against another for such acts as merely entering the property, or the like." *Id.* § 87 (footnotes omitted). An action for trespass, however, "may arise against a cotenant who has actually ousted another." *Id. See also Gillmor v. Gillmor*, 694 P.2d 1037, 1040 (Utah 1984) ("[A] cotenant who ousts another cotenant or acts in such a fashion as to necessarily exclude a fellow cotenant, violates the rights of that cotenant."). Consequently, a cotenant may freely exercise the right to use and enjoy the property—including leasing the property—so long as the cotenant does not oust or exclude another cotenant.

¶ 28 "Mere exclusive use of commonly held properties by one cotenant is not sufficient to establish an ouster." *Gillmor*, 694 P.2d at 1040. Rather, ouster generally occurs "when a cotenant out of possession makes a clear, unequivocal demand to use land that is in the exclusive possession of another cotenant, and that cotenant refuses to accommodate the other tenant's right to use the land." *Id.* at 1040–41. In other words, ouster "requires either an act of exclusion or use of such a nature that it necessarily prevents another cotenant from exercising his rights in the property." *Id.* at 1040.

¶ 29 Here, David exercised his right to lease the property to a third party by signing a rental agreement with the McCandlesses on April 5, 2002. Elizabeth argues, however, that by renting the home to the McCandlesses without her express permission, David trespassed upon her right to

enjoy the home and effectively excluded her from occupancy. Nothing in the record indicates, however, that Elizabeth wanted to re-occupy or possess the home after she moved out in January of 2002, leaving the home "winterized" as she did, or that it was the McCandlesses' occupancy of the property that was keeping her from moving back in. After she vacated the winterized home, she quit making mortgage payments and the utilities were turned off. Her testimony at trial was that her "ultimate goal" was to sell the property and save her and David's credit rating. She testified that the reason she did not want the McCandlesses to rent the home was because she believed that their presence in the home might hinder the sale of the home to other buyers—not that their occupancy would interfere with her intention to move back into the home. She never made a "clear, unequivocal demand" that she be permitted to move back into the property. *Id.* On the contrary, she visited the home multiple times, yet never told the McCandlesses that she wanted them to move out or that she wanted to move back in.[2]

¶ 30 Most importantly, David was not acting in a legal vacuum. On the contrary, there was a divorce decree directing the parties to sell the property "as soon as reasonably practicable." Thus, both parties carried a responsibility to do what they could to get the home sold. David's decision to put the McCandlesses in the property, while admittedly somewhat desperate, was in furtherance of that directive. He signed an earnest money agreement for the potential sale of the home to the McCandlesses with the expectation that the McCandlesses' loan would be approved and that they would purchase the home. When the McCandlesses' first loan application was denied, David offered to let the McCandlesses rent the home, under the assumption that a future loan would be approved and the McCandlesses would eventually purchase the property.

¶ 31 Selling the home had proven to be difficult, and the McCandlesses appeared to be the only promising option for selling the home. David and Elizabeth had been trying to sell the home since April of 2001. Although prospective buyers had looked at the home, no other offer had been made on it. While the McCandlesses may not have been ideal buyers, they were the only prospective buyers interested enough in the home to make an offer on it.

¶ 32 According to the record, the home was not one many prospective buyers would even consider purchasing. The roof of the home was in major disrepair, the yard needed to be retained and landscaped, the ceiling had fallen into the kitchen from roof and water damages, and the sump pump had gone out. The record also indicates that the property would likely have sat vacant indefinitely had the McCandlesses not rented the home. In fact, Elizabeth had not produced any other buyers, relisted the home with a realtor or broker, or otherwise done anything to discharge her co-equal obligation to sell the home. David, for his part, was following the divorce decree's directive to sell the home "as soon as reasonably practicable." [3]

¶ 33 In summary, David did not oust Elizabeth from the property or otherwise actually hinder her right to possess the property. Because David co-owned the home and because he and Elizabeth had been directed to sell the home, he had the right to put tenants in as part of his effort, ultimately successful, to sell the home. No evidence indicates that Elizabeth wanted to occupy or use the property herself. Rather, she merely disagreed with the way that David was selling the home. Renting the home to the McCand-

---

**2.** Although Elizabeth's attorney, on behalf of Elizabeth, sent the McCandlesses written notice to pay delinquent rent or quit possession, the McCandlesses' decision to remain in the property without paying all the rent they owed does not constitute trespass on the part of David or Susan Allen. Rather, this only goes to whether the McCandlesses were unlawful detainees of the property, subject to eviction.

**3.** Elizabeth also argues that David could not bind her to the rental agreement without her consent. This is true enough. *See Williams v. Singleton,* 723 P.2d 421, 423 (Utah 1986) ("One joint tenant or tenant in common cannot bind his cotenant by a contract which he may make relating to the common property."). The argument is irrelevant, however, as this case does not concern rights and responsibilities under the rental agreement.

lesses appeared to David to be the best option for getting the home sold. As the McCandlesses were the only seriously interested buyers, and actually ended up buying the home, it is hard to question the validity of his assessment. Clearly, David's decision to rent the home does not amount to a trespass.

¶ 34 The Allens also argue that the trial court should not have instructed the jury on trespass in regard to Susan Allen. They argue that Susan, as a matter of law, could not have trespassed upon Elizabeth's rights to enjoy the property because David gave Susan valid consent to sell or rent the home to the McCandlesses and Elizabeth gave Susan valid consent to sell the home. Elizabeth argues, in contrast, that the trial court was correct in instructing the jury on the law of trespass as regards Susan because Susan wrongfully caused the McCandlesses to occupy the property. We disagree that Susan wrongfully caused the McCandlesses to occupy the property.

¶ 35 Any involvement Susan had with the property and the McCandlesses was at least with the consent of David. "Conduct which would otherwise constitute a trespass is not a trespass if it is privileged. Such a privilege may be derived from the consent of the possessor." Restatement (Second) of Torts § 158 cmt. e (1965). *See also Haycraft v. Adams*, 82 Utah 347, 24 P.2d 1110, 1114–15 (1933) (holding "defendant was not guilty of trespass" because he had been authorized by plaintiff's wife to enter the home, sell or remove the furniture, and rent the property to a third party). Of course, Susan acted with both David's and Elizabeth's permission when she showed the home to the McCandlesses and prepared a written offer for them to buy the home. Elizabeth and David both signed two listing agreements that gave Susan permission to find a buyer for the home. The second listing agreement expired on March 22, 2002. In early March, Susan showed the McCandlesses the home and prepared a written offer for them to buy the home. Elizabeth and David signed their acceptance of the written offer. However, the McCandlesses' loan application was denied, and as a result, they did not purchase the home at that time. All of this took place before March 22, 2002, when the listing agreement terminated. Thus, all of Susan Allen's dealings with the McCandlesses up to that point in time were done with the permission of Elizabeth as well as David, and no trespass could have occurred.

¶ 36 Elizabeth argues that Susan nevertheless played a pivotal role in renting the home to the McCandlesses despite Elizabeth's objections, thereby trespassing on her rights in the property. Even if Susan played a pivotal role in renting the home, she did so with David's consent and thus did not perpetrate a trespass. *Cf. Haycraft*, 24 P.2d at 1114–15 (holding there was no trespass because defendant had permission of plaintiff's spouse to rent the property to third party). David asked Susan to prepare a rental agreement. However, Susan did not sign the rental agreement and had no standing to do so. Rather, the rental agreement was a legally binding agreement between David and the McCandlesses. Thus, it was David who rented the property to the McCandlesses, not Susan. Furthermore, it is undisputed that all of Susan's dealings with the McCandlesses were at least with David's permission.

¶ 37 As a matter of law, then, Susan Allen did not interfere with Elizabeth's rights to occupy the home or otherwise trespass on her interest therein. Any dealings Susan had with the McCandlesses were with the consent of either one or more of the co-owners of the property. Thus, the trial court should not have instructed the jury on the trespass claim against Susan, and we reverse the jury's improper verdict and resulting award of damages premised on that theory.[4]

4. Elizabeth also argues that Susan Allen should not have encouraged or helped David to sell the home to the McCandlesses when she knew that the McCandlesses had a poor credit rating and likely would not be able to obtain a loan. While such encouragement from one's mother and real estate agent would not likely be actionable in any event, this argument has no merit given that the McCandlesses did eventually obtain a loan and did purchase the home some ten months after first looking at it.

Elizabeth additionally complains that the only reason the McCandlesses were eventually extended a loan was because the Allens represented the

## D.  Punitive Damages

¶ 38 The Allens finally argue that the jury's verdict regarding punitive damages was so unsupported by the evidence that it cannot stand, as a matter of law.[5] We agree.

¶ 39 Under Utah law, punitive damages can be awarded only if "it is established by clear and convincing evidence that the acts or omissions of the tortfeasor are the result of willful and malicious or intentionally fraudulent conduct, or conduct that manifests a knowing and reckless indifference toward, and a disregard of, the rights of others." Utah Code Ann. § 78-18-1(1)(a) (Supp.2005). *See Mahana v. Onyx Acceptance Corp.*, 2004 UT 59, ¶ 44, 96 P.3d 893.

¶ 40 David, with Susan Allen's help, rented the home to the McCandlesses with the intention of getting the home sold. Although the McCandlesses were delinquent in their rental payments and their loan applications were denied multiple times, they were the only persons to make an offer on the home during the entire time it was up for sale. As previously discussed, David's choice was either to let the home sit vacant or to put renters in it. But for the efforts of David and Susan to put the McCandlesses in the property, David and Elizabeth would have been liable for a deficiency on the property following its foreclosure and would have owed property taxes and utility charges as well. In addition, they would have suffered considerable damage to their credit rating—a particular worry to Elizabeth. In fact, Elizabeth is in a much better position now than she would have been had the McCandlesses been kept out of the property.

¶ 41 It could be argued that the Allens should have found a better buyer for the home. As noted above, however, no other buyers had expressed serious interest in the property, which was hardly a showplace. Elizabeth never found a better buyer. She testified that her ultimate goal was to get the property sold and to save her credit. All of this was accomplished through the efforts of David and Susan Allen, culminating in the sale of the home to the McCandlesses. We fail to see how their efforts constituted "willful and malicious or intentionally fraudulent conduct, or conduct that manifests a knowing and reckless indifference toward, and a disregard of, the rights of others." Utah Code Ann. § 78-18-1(1)(a). We therefore vacate the jury's special verdict awarding Elizabeth punitive damages as against the Allens.

## CONCLUSION

¶ 42 The court responsible for the divorce proceeding did not have exclusive jurisdiction over the claims Elizabeth brought against David and Susan Allen. Nor were those claims barred by collateral estoppel or res judicata. Accordingly, we affirm the trial court's decision to deny the Allens' motion for partial summary judgment. The trial court erred, however, in instructing the jury on trespass. As a matter of law, there was no triable question of trespass presented by the evidence. Therefore, we vacate the jury's verdict and award of damages as it relates to a theory of trespass by Susan and David, as well as the jury's special verdict awarding Elizabeth punitive damages. We do, however, affirm the jury's verdict and

property as being worth 10% more than its actual worth in the earnest money agreement, and thus the lender was led to believe that the McCandlesses would have a 10% equity position in the home when in actuality it was making a loan in the amount of 100% of the value of the property. Even if this is true, and the bank's appraiser somehow went along with the scheme, we fail to see how Elizabeth was harmed by this conduct, which facilitated the sale of the property and relieved Elizabeth from the consequences of the property going into foreclosure and ruining her credit standing, as she feared.

5. Although the Allens' statement of the issues seeks a review of the jury's entire verdict, which would include tortious interference with economic relations and the jury's corresponding award of compensatory damages for the tortious interference, their actual argument is directed exclusively at the award of punitive damages. The award of compensatory damages for interference with economic relations is not meaningfully challenged on appeal. Thus, we limit our analysis to the issue of punitive damages as "we are 'not a depository in which [a party] may dump the burden of argument and research.'" *Smith v. Four Corners Mental Health Ctr., Inc.*, 2003 UT 23, ¶ 46, 70 P.3d 904 (alteration in original) (citations omitted).

corresponding award of damages against the Allens for tortious interference with Elizabeth's economic relations, for the reasons explained in note 5.

¶ 43 WE CONCUR: JAMES Z. DAVIS and PAMELA T. GREENWOOD, Judges.